**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
DORLA ALLEYNE,

                         Plaintiff,                           **MEMORANDUM & ORDER**

           - against -                              13-CV-3072 (SLT) (CLP)


SCHERVIER NURSING CARE CENTER
and BON SECOURS HEALTH CENTER, INC.,

                        Defendants.
-----------------------------------------------------------X

**TOWNES, United States District Judge,**

In this employment action, plaintiff Dorla Alleyne, a former Nursing Supervisor at

Schervier Nursing Care Center in Riverdale, New York, contends that she was subject to

discrimination and retaliation based on her national origin, ethnicity, ancestry, disability, and age

in violation of federal, state, and city law. Defendants have moved for summary judgment with

respect to all claims. For the reasons that follow, defendants' motion is granted.

## I.    Background

### A.    Plaintiff's Violation of Local Civil Rule 56.1

Local Civil Rule 56.1 requires a party moving for summary judgment to submit a

"statement, in numbered paragraphs, of the material facts as to which the moving party contends

there is no genuine issue to be tried." Local Civ. R. 56.1(a). The opposing party, in turn, must

submit a counterstatement of "correspondingly numbered paragraph[s] responding to each

numbered paragraph in the statement of the moving party, and if necessary, additional

paragraphs . . . of additional material facts as to which" the opposing party "contend[s] that there

exists a genuine issue to be tried." Local Civ. R. 56.1(b). "Each statement by the movant or

opponent . . . must be followed by citation to [admissible] evidence . . . ." Local Civ. R. 56.1(d).

When a Rule 56.1 statement or counterstatement lacks citations, courts are "free to disregard" the facts asserted therein. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted). Also, if the opposing party disputes facts asserted in the moving party's Rule 56.1 statement without citing contradictory evidence, district courts may deem the facts in the movant's statement true if they are supported by evidence. *See, e.g.*, *Garnett-Bishop v. New York Cmty. Bancorp, Inc.*, No. 12-CV-2285 (ADS) (ARL), 2017 WL 836562, at *3 (E.D.N.Y. Mar. 2, 2017) (collecting cases). After all, courts are not required "'to perform an independent review of the record to find proof of a factual dispute.'" *Morales v. New York State Dep't of Labor, Div. of Employment Servs.*, 530 F. App'x 13, 14 (2d Cir. 2013) (quoting *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002)).

Here, all paragraphs in defendants' Rule 56.1 statement include citations to the record. *See* Defendants' Statement of Undisputed Material Facts dated Jan. 15, 2016, Dkt. No. 66 ("Def. 56.1"). Plaintiff's Rule 56.1 counterstatement, however, contains no such citations. *See* Plaintiff's Response to Defendants' Statement dated Oct. 29, 2015, Dkt. No. 43-1 ("Pl. 56.1").[1] Plaintiff's opposition brief includes a 40-paragraph factual statement, but that too lacks citations. *See* Plaintiff's Memorandum of Law in Opposition dated Oct. 20, 2016, Dkt. No. 67 ("Pl. Opp.") ¶¶ 4–44.

Thus, where cited evidence supports facts contained in defendants' Rule 56.1 statement and plaintiff disputes those facts without citing conflicting evidence, the Court deems the facts asserted in defendants' statement true. *See, e.g.*, *James. v. N.Y.C. Health & Hosp. Corp.*, No. 15-

---

[1] Plaintiff, who is represented by counsel, did not even file a Rule 56.1 counterstatement with her opposition papers. In accordance with the undersigned's individual rules, however, plaintiff previously filed a counterstatement with her letter responding to defendants' request for a pre-motion conference. The Court assumes that plaintiff intended to rely on this previously filed counterstatement, not that she neglected to file one altogether.

CV-6015 (PAE), 2017 WL 3923675, at *1 n.1 (S.D.N.Y. Sept. 6, 2017). Also, given the lack of

citations, the Court disregards the facts asserted in plaintiff's opposition papers. *See, e.g., Paul*

*v. Lenox Hill Hosp.*, No. 13-CV-1566 (CBA) (LB), 2016 WL 4775532, at *2 n.2 (E.D.N.Y. Jan.

15, 2016), *adopted by*, 2016 WL 1271034 (E.D.N.Y. Mar. 29, 2016), *appeal dismissed* (2d Cir.

Nov. 2, 2016) ("Plaintiff makes various factual assertions in her Rule 56.1 counterstatement, but

fails to cite record evidence to support her factual assertions. . . . These assertions are therefore

disregarded.").[2]

### B.    Factual History

####    1.    Nursing Supervisor Position and Survey-Related Work

Plaintiff, who was born in Costa Rica and who is currently 67 years old, began working

for defendant Schervier Nursing Care Center ("SNCC") in 2006. Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.[3] In

February 2010, plaintiff transitioned from the title of Patient Service Manager to Nursing

Supervisor. Def. 56.1 ¶ 2 n.2; Pl. 56. ¶ 2. The letter appointing her to the Nursing Supervisor

position stated that her assignment would include evening and night shifts, but that she "may, at

times, be required to work days and/or times outside of [her] regular schedule." Def. 56.1 ¶ 4;

---

[2] One paragraph in the argument section of plaintiff's opposition brief contains a citation to deposition testimony. Pl. Opp. ¶ 90. Four paragraphs of her opposition brief quote or paraphrase testimonial or documentary evidence without citation. *Id.* ¶¶ 42, 67, 75, 99. The Court considers the evidence referred to in these five paragraphs but does not otherwise seek evidentiary support for plaintiff's contentions. *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (on summary judgment motion, district court "is not required to consider what the parties fail to point out"). The Court notes that plaintiff cites her complaint in two instances as if this pleading were evidence, which of course it is not. Pl. Opp. ¶¶ 64, 91; *see, e.g., Hernandez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234 (BMC), 2013 WL 6388654, at *3 (E.D.N.Y. Dec. 6, 2013) ("[I]t is of course fundamental that allegations in a complaint are not evidence that can defeat a motion for summary judgment.") (internal quotation marks omitted).

[3] Citations to paragraphs of defendants' Rule 56.1 statement incorporate by reference the evidence cited therein.

Pl. 56.1 ¶ 4. Karen Wilson, SNCC's Vice President of Nursing, was plaintiff's supervisor. Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8. Without citing evidence, plaintiff asserts that Wilson is Jamaican and approximately 25 years younger than plaintiff. Pl. Opp. ¶ 6.

Although plaintiff had primarily worked evening and night shifts since February 2010, she was asked to temporarily work the day shift in November 2010 to prepare for a survey being conducted by the New York State Department of Health the next month. Def. 56.1 ¶¶ 7, 30; Pl. 56.1 ¶¶ 7, 30. Plaintiff testified that she had reached an agreement to allow her to return to her prior schedule when the survey was completed. Def. 56.1 ¶ 35; Pl. 56.1 ¶ 35. Another SNCC employee, Karen Hollingsworth—who is 59 years old and who, according to plaintiff, was "born in the United States" and is "of African descent"—was also assigned to assist with the survey. Def. 56.1 ¶¶ 31–32; Pl. 56.1 ¶¶ 31–32.

After the survey concluded in December 2010, SNCC was required to complete certain audits and other survey-related follow-up work. Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36. Although plaintiff requested to return to her prior schedule, she and Hollingsworth were assigned to the day shift until February 2011 to complete the follow-up tasks. Def. 56.1 ¶¶ 37–39, 41, 51; Pl. 56.1 ¶¶ 37–39, 41, 51. Plaintiff and Hollingsworth worked similar hours from November 2010 to February 2011. Def. 56.1 ¶¶ 34, 40; Pl. 56.1 ¶ 34.[4]

---

[4] Plaintiff admits that she and Hollingsworth worked a similar schedule while preparing for the survey, but disputes that they did so while performing the follow-up tasks. Pl. 56.1 ¶¶ 34, 40. Plaintiff alleges, without citation, that Hollingsworth returned to her prior position upon the conclusion of the survey in December 2010, while plaintiff was left "overloaded with duties and responsibilities." Pl. Opp. ¶¶ 28–29. Plaintiff does not explain what she means when she states that Hollingsworth returned to her prior position. Hollingsworth's time records demonstrate that she continued to work the day shift in January and February in 2011. Ex. K (Hollingsworth's time records). To the extent that plaintiff believes that she worked longer hours than Hollingsworth, any such disparity is not evident from the time records for these months. *Compare id. with* Ex. E (Plaintiff's time records).

On February 15, 2011, plaintiff received a written warning from Wilson for failing to complete survey-related audit summaries. Def. 56.1 ¶ 43. Although plaintiff testified at her deposition that this written warning prevented her from returning to the evening shift, plaintiff's time records indicate that she began working evening and night shifts again on February 20, five days after the issuance of the warning. *Id.* ¶¶ 50, 51, 53; Pl. 56.1 ¶ 51. Plaintiff testified at her deposition that she was required to work the day shift to cover for Wilson while Wilson was on vacation. Def. 56.1 ¶ 52. After February 20, however, plaintiff's time records reflect that she worked the day shift exclusively except for one day (February 28). *Id.* ¶ 54. For all of March, plaintiff was scheduled for evening and night shifts only. *Id.* ¶ 56.

## 2. EEOC Charge

On February 24, 2011, plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") in which she claimed, among other things, that Wilson had discriminated against her based on her national origin by issuing the written warning on February 15. *Id.* ¶¶ 58–61; Pl. 56.1 ¶¶ 58–61; Ex. N (EEOC charge).[5] The notice of charge of discrimination that the EEOC sent to defendants is dated March 4, 2011. Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59. Plaintiff testified at her deposition that James Higgins, the former Chief Executive Officer of defendant Bon Secours Health System, Inc., notified her that the company had received her "'notice.'" Def. 56.1 ¶¶ 62–63; Pl. 56.1 ¶¶ 62–63.[6] No one else at work commented to plaintiff about her EEOC filing. *Id.* Higgins' employment with defendants ended on April 12, 2011. Def. 56.1 ¶ 64; Pl. 56.1 ¶ 64.

---

[5] As plaintiff's opposition papers do not include exhibits, all citations to exhibits refer to those annexed to defendants' Rule 56.1 statement.

[6] Though the parties' submissions do not address this subject, Bon Secours Health System, Inc. appears to be the owner of SNCC. Plaintiff misidentified Bon Secours Health System, Inc. as "Bon Secours Health Center, Inc." in her complaint.

### 3.   FMLA Leave Request

Plaintiff often used vacation time to travel to Costa Rica to care for her aunt.  Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.  From December 31, 2010, to January 5, 2011, plaintiff used vacation time for this purpose.  Def. 56.1 ¶¶ 27–29; Pl. 56.1 ¶¶ 27–29.  Sometime in January 2011, plaintiff spoke with Wilson about taking leave pursuant to the Family Medical Leave Act ("FMLA") to care for her aunt again.  Def. 56.1 ¶ 65.  Wilson informed plaintiff that she needed to submit documentation in accordance with defendants' FMLA policies, which, among other things, required employees to submit "medical certification of the [underlying] serious health condition."  Def. 56.1 ¶¶ 15–16, 66; Pl. 56.1 ¶¶ 15–16, 66.  Plaintiff does not dispute having notice of SNCC's FMLA policy.  Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.

Plaintiff submitted an FMLA application on February 18, 2011, for leave from February 25 to March 13, 2011, stating that she sought to "care for [an] aunt who is childless—whom I am responsible for.  Emergency amputation."  Def. 56.1 ¶¶ 67–68; Pl. 56.1 ¶ 68.  After receiving notice from a human-resources representative that her leave application was missing documentation, plaintiff submitted another FMLA application on February 29, requesting leave from March 11 to April 2.  Def. 56.1 ¶¶ 70, 72; Pl. 56.1 ¶¶ 70, 72.  Plaintiff, however, never submitted the missing documentation, apparently because she had difficulty having her aunt's medical providers complete the necessary paperwork.  Def. 56.1 ¶¶ 82–83; Pl. 56.1 ¶¶ 82–83.  Nevertheless, on March 25, SNCC's outside benefits-management company gave plaintiff permission to travel to Costa Rica and to return the required paperwork one week after her arrival.  Def. 56.1 ¶ 83; Pl. 56.1 ¶ 83.  Wilson approved plaintiff's request for vacation for this period.  Def. 56.1 ¶ 84; Pl. 56.1 ¶ 84.  As discussed below, however, plaintiff stopped arriving

for work after March 14, and she did not make the trip to Costa Rica. Def. 56.1 ¶ 86; Pl. 56.1 ¶ 86.

### 4. Comments about Plaintiff's Age and National Origin

When asked whether coworkers had commented on her national origin, plaintiff testified at her deposition that sometime around 2010 one nurse had said that plaintiff was "getting so much flak" because she was not Jamaican. Ex. A (Pl. Dep.) at 35:23–36:6, 39:24–40:4, 40:22–41:8; Pl. Opp. ¶ 67. According to plaintiff's deposition testimony, sometime in 2010 or 2011, another coworker said, "maybe if [she] were a Jamaican, this wouldn't be happening." Ex. A (Pl. Dep.) at 37:18–38:17; Pl. Opp. ¶ 67. Plaintiff did not testify that Wilson commented on her national origin. Ex. A (Pl. Dep.) at 41:9–42:7. Regarding her age, however, plaintiff testified that Wilson had said over the years that plaintiff was "the older one here and . . . ha[d] more experience" when assigning her tasks. *Id.* at 32:12–34:6; Pl. Opp. ¶ 75.

### 5. Injuries and Termination

On March 7, 2011, plaintiff injured her neck and back while attempting to move a bariatric patient from bed. Def. 56.1 ¶ 90; Pl. 56.1 ¶ 90. Three days later, on March 10, plaintiff injured her right hand, right wrist, and back while attempting to move a patient to a wheelchair. Def. 56.1 ¶ 91; Pl. 56.1 ¶ 91. Plaintiff's time records indicate that she worked on March 13 and 14, but not anytime thereafter. Def. 56.1 ¶ 92 n.6.

Plaintiff testified at her deposition that no one told her to stop coming to work, but that she stopped anyway because her injuries would have prevented her from doing her job. *Id.* ¶ 94. At her deposition, plaintiff testified that she could have worked with "some accommodation," but she could not identify one that would have enabled her to work. *Id.* ¶¶ 96–97; Pl. 56.1 ¶ 96.

There is no evidence in the record that plaintiff ever requested an accommodation. *See* Def. 56.1 ¶ 95.

On April 26, 2011, plaintiff sent Wilson an email explaining the circumstances of her March 10 injury and noted that she was receiving treatment for it. Dkt. No. 69 (Email dated Apr. 26, 2011). It is unclear what prompted this email.[7] Wilson's employment with SNCC ended on May 20. Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9.

By letter dated September 20, 2011, Sean Ballard, who had begun acting as SNCC's Interim Director of Human Resources a month earlier, informed plaintiff that she was terminating her employment effective immediately for abandoning her job and being absent without leave. Def. 56.1 ¶¶ 102, 109; Pl. 56.1 ¶ 109; Pl. Opp. ¶ 42; Ex. F (Ballard Decl.) ¶ 2. The letter stated as follows:

> You have not been to work since March 14, 2011, and have no leave to cover your continued absence. You also have not provided any documentation to support a medical or family-related leave under the FMLA. Finally, . . . you have not returned phone calls inquiring about your absence.

Def. 56.1 ¶ 109; Pl. 56.1 ¶ 109. At the time of her decision to terminate plaintiff, Ballard was unaware of any communications from plaintiff to defendants regarding her status or her intention to return to work. Def. 56.1 ¶ 107. At this time, Ballard had never met plaintiff and had no knowledge of her national origin, ancestry, ethnicity, disability, medical condition, or age. *Id.* ¶¶ 104–05, 113; Pl. 56.1 ¶¶ 105, 113. Wilson and Higgins,

---

[7] On November 7, 2016, four days after defendants' motion for summary judgment was fully submitted and ready for decision, plaintiff filed this April 26 email message on the docket as a standalone document—without explaining its relevance or the reason for its untimely filing. Dkt. No. 69. Defendants then moved to strike the email from the record arguing that it was not produced in discovery and was not annexed to or referred to in plaintiff's opposition papers. Dkt. No. 70. To date, plaintiff has not opposed defendants' motion to strike. Because defendants are entitled to summary judgment even if the Court considers the April 26 email, the Court need not rule on this issue and defendants' motion to strike is therefore denied as moot.

who were no longer employed by defendants, had no influence over Ballard's decision to terminate plaintiff. Def. 56.1 ¶ 103; Pl. 56.1 ¶ 103.

### 6. Application for Disability Benefits

On November 30, 2011, plaintiff applied to the Social Security Administration ("SSA") for disability benefits, representing that she had been unable to work since March 15, 2011. Def. 56.1 ¶¶ 115–16; Pl. 56.1 ¶¶ 115–16. Plaintiff's treating physician completed several reports between March 2011 and September 2012, in which he opined that plaintiff was totally disabled. Def. 56.1 ¶ 125; Pl. 56.1 ¶ 125.[8] In support of her claim for disability benefits, plaintiff represented that her job involved "prolonged standing and walking, as well as frequent stair climbing, bending, lifting and carrying." Def. 56.1 ¶ 127; Pl. 56.1 ¶ 127. Plaintiff also informed the SSA that her position required her to walk for four hours per day; stand for one hour per day; and write, type, or handle small objects for two hours per day. Def. 56.1 ¶¶ 119, 121; Pl. 56.1 ¶¶ 119, 121. (At her deposition, plaintiff testified that she had to stand for approximately two hours daily. Def. 56.1 ¶ 120; Pl. 56.1 ¶ 120.) In a hearing before an SSA administrative law judge ("ALJ"), plaintiff testified that she could stand for only 30 minutes and walk the distance of two to three city blocks before experiencing numbness and pain. Def. 56.1 ¶ 130; Pl. 56.1 ¶ 130. She also testified that her dominant (right) hand was so debilitated that she could not wipe herself in the bathroom. Ex. NN (SSA Tr.) at 4:3–15, 6:25–7:2 (cited in Def. 56.1 ¶¶ 129–30).

In a decision dated October 18, 2012, the ALJ concluded that plaintiff had been disabled as of March 15, 2011, enabling her to collect disability benefits. Def. 56.1 ¶¶ 131–32; Pl. 56.1 ¶¶ 131–32. The ALJ determined that plaintiff could not perform her past work as a Nursing

---

[8] Plaintiff testified at her deposition that she agreed with her physician's assessment that she was "100 percent" impaired. Ex. A (Pl. Dep.) at 230:2–24 (cited in Def. 56.1 ¶¶ 123–24).

Supervisor because her condition limited her to "sedentary work" not requiring "repetitive motion with her right hand." Def. 56.1 ¶ 132; Pl. 56.1 ¶ 132.

### C. Procedural History

Plaintiff commenced this lawsuit by filing a complaint dated March 12, 2013, in New York State Supreme Court, County of Kings. *See* Complaint dated Mar. 12, 2013, Dkt. No. 1-2 ("Compl."). In her complaint, plaintiff maintained that she had been subject to discrimination based on her national origin, ethnicity, and ancestry in violation of 42 U.S.C. § 1981, the New York State Human Rights Law ("SHRL"), and the New York City Human Rights Law ("CHRL"). *Id.* ¶ 81. She also asserted claims of age and disability discrimination under the SHRL and CHRL. *Id.* ¶¶ 80, 82. Finally, she claimed retaliation under the SHRL, CHRL, and § 1981. *Id.* ¶ 83.[9]

Defendants removed this case from state court to this District on May 24, 2013. Dkt. No. 1. Defendants later moved for summary judgment through papers dated January 15, 2016. *See* Defendants' Memorandum of Law dated Jan. 15, 2016, Dkt. No. 65-2 ("Def. Mem."). Plaintiff opposed defendants' motion through papers dated October 20, 2016. *See* Pl. Opp., Dkt. No. 67. Defendants replied on November 3, 2016. *See* Defendants' Reply Memorandum of Law dated Nov. 3, 2016, Dkt. No. 68 ("Def. Reply.").

## II. Discussion

### A. Rule 56 Standard

"On a defendant's motion for summary judgment, courts must 'construe the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in her favor.'" *Richardson-Holness v. Alexander*, 196 F. Supp. 3d 364, 369

---

[9] The complaint also included FMLA claims, but plaintiff later stipulated to the dismissal of them. Compl. ¶ 84; Dkt. No. 14.

(E.D.N.Y. 2016) (quoting *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 65 (2d Cir. 2014)). Summary judgment is proper when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). An "'extra measure of caution is merited'" before granting "'summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions.'" *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)). Still, "'summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.'" *Id.*

### B. Discrimination Claims

#### 1. *McDonnell Douglas* Burden-Shifting Framework

Plaintiff's claims of employment discrimination under § 1981, the SHRL, and CHRL are subject to the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Jackson v. Sleepy's, LLC*, No. 13-CV-2086 (FB) (SMG), 2016 WL 1223452, at *3 (E.D.N.Y. Mar. 29, 2016). At the first step, plaintiff has the burden of establishing a *prima facie* case. To do so, "a plaintiff must show: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she experienced an adverse employment action; and (4) that action occurred under circumstances giving rise to an inference of discrimination." *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 109 (2d Cir. 2011) (listing same elements for discrimination claims based on age, race, and national origin under § 1981, SHRL, and CHRL). The *prima facie* elements differ for claims of disability discrimination. To establish a *prima facie* case of disability discrimination under the SHRL and CHRL, a plaintiff must show "that (1) her employer is subject to the []SHRL and []CHRL; (2)

11

she was disabled within the meaning of the []SHRL and []CHRL; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability." *Gioia v. Forbes Media LLC*, No. 09-CV-6114 (RJS), 2011 WL 4549607, at *9 (S.D.N.Y. Sept. 30, 2011), *aff'd*, 501 F. App'x 52 (2d Cir. 2012).

If the plaintiff establishes a *prima facie* case, the "burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the disparate treatment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (internal quotation marks omitted). "If the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination." *Id.* (internal quotation marks omitted).

### 2. State and Federal Claims

#### a. *Prima Facie* Case

##### i. Adverse Employment Action

Although defendants admit that plaintiff's termination was an adverse employment action, defendants insist that her termination was the only adverse action that plaintiff suffered. Def. Mem. at 7. "[A] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Dickens v. Hudson Sheraton Corp. LLC*, 689 F. App'x 670, 672 (2d Cir. 2017) (citation omitted). The "change . . . must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Vega*, 801 F.3d at 85). Examples of adverse employment actions include "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities.'" *Id.*

Here, leaving aside her termination, plaintiff was required to work the day shift from November 2010 to February 2011, even though she agreed to work this shift only until the survey's conclusion in December 2010. *See supra* at 4. Also, plaintiff received a written warning from Wilson in February 2011 for failing to complete survey-related audit summaries. *Id.* at 5. Lastly, when plaintiff requested FMLA leave to care for her aunt in March 2011, approval was delayed because of missing documentation. *Id.* at 6.

To the extent that plaintiff contends that any of this conduct amounts to a materially adverse employment action, the Court rejects this argument. Courts have repeatedly concluded that conduct of this nature is not actionable. *See, e.g., Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568–72 (2d Cir. 2011) (counseling, threats of termination, hostile behavior at a meeting, being forced to work on day off under false pretenses, and assignment to night shift were not materially adverse actions when considered individually or in the aggregate); *Pierre v. Napolitano,* 958 F. Supp. 2d 461, 479 (S.D.N.Y. 2013) ("requiring an employee to provide medical documentation is not a materially adverse action") (alteration and internal quotation marks omitted); *Hamedl v. Weiland*, No. 10-CV-2738 (SJF) (GRB), 2012 WL 3903499, at *8 (E.D.N.Y. Sept. 6, 2012) (reassignment from midnight shift to 6:00 a.m. shift not materially adverse action); *Albuja v. Nat'l Broadcasting Co. Universal, Inc.*, 851 F. Supp. 2d 599, 609 (S.D.N.Y. 2012) (assignment to overnight shift was not adverse employment action where plaintiff had "not asserted that working night shifts caused any diminution in his compensation or job responsibilities"); *Lucas v. Potter*, No. 3:08-CV-480 (HBF), 2010 WL 148451, at *8 (D. Conn. Jan. 12, 2010) ("Because the failure to grant sick leave is directly attributable to [plaintiff's] failure to provide medical documentation required by the [employee] manual, the temporary denial of sick leave was not a materially adverse action."); *Smalls v.*

*Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[B]eing yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments do not rise to the level of adverse employment actions because they do not have a material impact on the terms and conditions of Plaintiff's employment.") (internal quotation marks and alterations omitted). Thus, the Court concludes that plaintiff's termination was the only materially adverse employment that she suffered.

> ii.  **Adverse Action Under Circumstances Giving Rise to Inference of Discrimination, or Adverse Action "Because of" Plaintiff's Disability**

The record is devoid of evidence that plaintiff's termination took place under circumstances giving rise to an inference of discrimination, or that plaintiff was terminated because of her disability. Ballard, who had only started acting as SNCC's Interim Director of Human Resources a month earlier, decided to terminate plaintiff's employment in September 2011—approximately six months after plaintiff stopped working. *See supra* at 7–8. At this point, Ballard had never met plaintiff, and she was unaware of plaintiff's national origin, ethnicity, ancestry, medical condition, disability status, or age. *Id.* at 8. In opposition, plaintiff cites no evidence to the contrary—much less evidence that Ballard harbored discriminatory animus toward her. Given Ballard's decision-making authority and her unawareness of plaintiff's protected characteristics, it is difficult to believe that plaintiff's termination was discriminatory. *See, e.g., McDowell v. T-Mobile USA, Inc.*, 307 F. App'x 531, 533 (2d Cir. 2009) (dismissing race-discrimination claim where Washington-based "critical decision-maker" had never met New York-based plaintiff and only learned of his race after litigation began).

Although it is possible to prevail on a discrimination claim when the decision-maker is unaware of the plaintiff's protected characteristics, *see, e.g., Weber v. Parfums Givenchy, Inc.*,

49 F. Supp. 2d 343, 361–62 (S.D.N.Y. 1999) (collecting cases), there must still be evidence that discriminatory animus influenced the decision. Here, plaintiff has not offered evidence that any SNCC employees who commented on her age and national origin influenced Ballard's decision to terminate plaintiff. *See supra* at 7; *De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 643 (S.D.N.Y. 2011) ("allegedly discriminatory comments made by a nondecisionmaker are, as a matter of law, insufficient to raise an inference of discrimination"). Despite Wilson's comments about plaintiff being older and more experienced, Wilson stopped working for SNCC in May 2011—four months before plaintiff's termination. *See supra* at 8. Ballard attested that Wilson did not influence her decision, *id.* at 8–9, and plaintiff has cited no evidence to the contrary.

Although plaintiff suggests that defendants may have actually decided that plaintiff abandoned her job while Wilson was still at SNCC (even though they did not terminate her until later), plaintiff offers no evidence to support this theory. *See* Pl. Opp. ¶ 69; *Kolivas v. Credit Agricole*, No. 95-CV-5662 (DLC), 1996 WL 684167, at *4 (S.D.N.Y. Nov. 26, 1996), *aff'd*, 125 F.3d 844 (2d Cir. 1997) ("[A] plaintiff may not rely solely on a request that the factfinder disbelieve testimony about when an employer made the decision to fire the plaintiff . . . ."). Plaintiff also argues that Wilson's "notations" in plaintiff's file may have influenced Ballard. Pl. Opp. ¶ 75. But plaintiff cites no evidence of such notations or any influence that they may have had on Ballard.

Plaintiff also argues that an employer's "dissembling" can be persuasive evidence of discrimination. Pl. Opp. ¶¶ 48–51. The implication is that defendants lied about the reason for terminating plaintiff to conceal their discriminatory motives. The problem is that plaintiff points to no evidence of dissembling. To survive summary judgment, the plaintiff must offer evidence to allow a jury to "rationally infer—as opposed to speculate—that [defendants were]

15

'dissembling to cover up a discriminatory purpose.'" *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 114 (S.D.N.Y. 2009) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000)).

Finally, plaintiff argues that similarly situated younger Jamaican (or at least non-Costa Rican) employees—namely, Joan Constantine, Karen Hollingsworth, and Delbert Harris—received preferential treatment relative to her. Pl. Opp. ¶ 64; *see also* Compl. ¶¶ 62, 61–62, 64–65.[10] "To support a minimal inference of discrimination, a plaintiff may allege disparate treatment by showing the more favorable treatment of employees not in the protected group, who are similarly situated in all material respects." *Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017) (internal quotation marks and citations omitted). Although plaintiff maintains that Constantine, Hollingsworth, and Harris are similarly situated to her, she cites no evidence to support this assertion. Pl. Opp. ¶¶ 64–65; *see, e.g.*, *Taylor v. Local 32E Serv. Employees Int'l Union*, 118 F. App'x 526, 528 (2d Cir. 2004) (granting summary judgment where plaintiff "provides no evidence" that plaintiff was similarly situated to purported comparators).

Even assuming that she was similarly situated to them, plaintiff offers no proof that these three coworkers enjoyed preferential treatment. Plaintiff alleges that Constantine received leave in November 2010 to care for her mother in Jamaica without submitting the necessary FMLA documentation. Pl. Opp. ¶¶ 32–33. Yet Constantine's time records do not reflect her taking leave around this month, and plaintiff submits no evidence of such leave. Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89. Plaintiff complains that Hollingsworth returned to her regular schedule following the conclusion of the survey in December 2010. In her Rule 56.1 statement, however, plaintiff admits that Hollingsworth also assisted with survey-related follow-up work. Pl. 56.1 ¶ 39.

---

[10] Although plaintiff testified at her deposition that Hollingsworth was American, *see supra* at 4, her opposition papers suggest that she is Jamaican. Pl. Opp. ¶ 64.

Although plaintiff appears to believe that she worked longer hours than Hollingsworth in January and February 2011, she offers no explanation or evidence to support this assertion. *See supra* at 4 n.4. Lastly, plaintiff complains that Harris was not disciplined for failing to complete reports and other misconduct. Pl. Opp. ¶¶ 34–35. To the extent that this allegation is true, plaintiff has neglected to support it with evidence. *Id.* For these reasons, the Court concludes that plaintiff has failed to raise an inference of discrimination for purposes of her federal and state claims.

### iii. Qualified for Position

Defendants argue that plaintiff is judicially estopped from claiming that she was qualified for her position as a Nursing Supervisor given her representations to the SSA that she had become unable to work in March 2011. Def. Mem. at 3–6, 19–21. "[J]udicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by that party in a prior legal proceeding," including a prior SSA proceeding. *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 137 (2d Cir. 2016) (internal quotation marks omitted); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999). As the Supreme Court concluded in *Cleveland*, however, a plaintiff's representation to the SSA that she is unable to work for purposes of a claim for disability benefits does not necessarily preclude her from arguing that she was qualified for a position for purposes of establishing a *prima facie* case of employment discrimination. *Cleveland*, 526 U.S. at 802–03. Yet the plaintiff "cannot simply ignore the apparent contradiction" and "must proffer a sufficient explanation" for it. *Id.* at 806.

Here, plaintiff appears to offer two explanations. *First*, she contends that she could have continued working had SNCC offered her a reasonable accommodation. Pl. Opp. ¶¶ 52–53, 57, 89–91. This explanation, which the Supreme Court addressed in *Cleveland*, is based on the fact

that a plaintiff claiming disability discrimination must show that she is qualified to "perform the essential functions of her job with reasonable accommodation, whereas disability under the Social Security Act does not take into account the possibility of reasonable accommodation." *Kovaco*, 834 F.3d at 137–38 (citing *Cleveland*, 526 U.S. at 803).[11]

Here, plaintiff has offered no evidence that a reasonable accommodation would have allowed her to perform the essential functions of her former position. Plaintiff represented to the SSA that her position required her to walk for four hours per day; stand for one hour per day; and write, type and handle small objects for two hours per day. *See supra* at 9. (As noted above, plaintiff testified at her deposition that she spent two hours daily standing. *Id.*) In her hearing before an ALJ, however, plaintiff testified that she could only walk the distance of two or three city blocks before experiencing numbness and pain, and that her dominant hand was so debilitated that she could not even use it to wipe herself in the bathroom. *Id.* At her deposition, when asked whether she could have performed the duties of her prior position, plaintiff replied, "No, not as a nurse supervisor" and later testified that she could not "think of anything" that she could have done in that role. Ex. A (Pl. Dep.) at 386:24–387:6 (cited in Def. 56.1 ¶ 135); Pl. Opp. ¶ 90. Plaintiff said that she could answer phones but, by her own admission, that was the work of a "receptionist," not a nurse. Def. 56.1 ¶ 98. Plaintiff's belief that she could have performed the functions of another position, standing alone, is insufficient to meet the

---

[11] The qualification prong to establish a *prima facie* case of disability discrimination differs from the qualification prong of other types of discrimination. *See Kovaco*, 834 F.3d at 136. Specifically, a plaintiff claiming disability discrimination must show that she was "'qualified to perform the essential functions of his job, *with or without reasonable accommodation*,'" whereas a plaintiff claiming other types of discrimination must simply show that she was qualified for the position. *Id.* (emphasis in original); *see supra at* 11–12 (listing *prima facie* elements). The Second Circuit has concluded, however, that "*Cleveland* provides the proper framework for evaluating whether judicial estoppel bars" claims of disability and non-disability discrimination alike. *See Robinson v. Concentra Health Servs.*, Inc., 781 F.3d 42, 46 (2d Cir. 2015).

qualification prong of the *prima facie* case. *See, e.g., Hudson v. W. New York Bics Div.*, 73 F. App'x 525, 529 (2d Cir. 2003) (employers "are not required to find another job for an employee who is not qualified for the job he or she was doing") (internal quotation marks omitted); *Weiglein v. Nat'l Grid*, No. 11-CV-809A, 2013 WL 4718499, at *9 (W.D.N.Y. Sept. 3, 2013) ("Plaintiff's conclusory assertions that defendant should have reassigned him to another position are insufficient to establish the existence of an available and appropriate position as a reasonable accommodation.").

In short, to the extent that plaintiff could have worked with a reasonable accommodation, plaintiff has not cited evidence to demonstrate as much. Plaintiff's speculation that some unidentified accommodation may have existed is insufficient to create a triable issue of fact. *See Sefovic v. Mem'l Sloan Kettering Cancer Ctr.*, No. 15-CV-5792 (PAC), 2017 WL 3668845, at *4 (S.D.N.Y. Aug. 23, 2017) ("The plaintiff must show that a reasonable accommodation existed at the time of his dismissal. . . . The burden of persuasion on the existence of an effective accommodation is not satisfied by mere speculation.") (citing *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 231 (2d Cir. 2017) and *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)) (internal quotation marks omitted).

*Second*, plaintiff emphasizes that there is no evidence that her injuries were permanent— meaning that, but for her termination, she may have returned to work after she healed. Pl. Opp. ¶ 54. As defendants note, however, the question is whether plaintiff was qualified for the position at the time of her termination—not some later date. Def. Reply at 8–9; *see, e.g., Kovaco*, 834 F.3d at 136 (noting plaintiff's burden to show "that he was qualified for the position he held *at the time of termination*") (emphasis added); *Sefovic v. Mem'l Sloan Kettering Cancer Ctr.*, No. 15-CV-5792 (PAC), 2017 WL 3668845, at *5 (S.D.N.Y. Aug. 23, 2017) (report stating

that plaintiff could perform light work two months after termination did not establish that plaintiff could work "'at the time of his dismissal'") (quoting *Stevens*, 851 F.3d at 231). For these reasons, plaintiff has failed to create a triable issue of fact as to whether she was qualified for her position at the time of her termination.

### b. Legitimate, Nondiscriminatory Reason

Even if plaintiff could establish a *prima facie* case, defendants have articulated legitimate, nondiscriminatory reasons for her termination. At the second step of the *McDonnell Douglas* framework, any "'such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision.'" *Pierce v. Highland Falls-Fort Montgomery Cent. Sch. Dist.*, No. 08-CIV-1948 (RKE), 2011 WL 4526520, at *10 (S.D.N.Y. Sept. 28, 2011) (quoting *Austin v. Ford Models*, 149 F.3d 148, 153 (2d Cir. 1998)); *see also Dollman v. Mast Indus., Inc.*, 731 F. Supp. 2d 328, 339 (S.D.N.Y. 2010) (defendant "is required to articulate—but not prove—a legitimate, nondiscriminatory reason for the discharge" and, thus, the "burden of production is not a demanding one") (internal quotation marks and citations omitted).

The September 20, 2011 letter terminating plaintiff's employment noted that she had not "been to work since March 14, 2011" and had not received "leave to cover [her] continued absence." Def. 56.1 ¶ 109; Pl. 56.1 ¶ 109; Pl. Opp. ¶ 42. Although plaintiff repeatedly asserts that she was on "leave" while recovering from her injury, she has cited no evidence to that effect. Pl. Opp. ¶¶ 68, 71. Consequently, defendants have met their burden of articulating a legitimate, nondiscriminatory reason for terminating her. *See Campbell v. Cty. of Onondaga*, No. 5:04-CV-1007 (NAM) (GHL), 2009 WL 3163498, at *18 (N.D.N.Y. Sept. 29, 2009) (unexcused absences over 10-day period formed legitimate basis for termination) (citing cases); *Butler v. Potter*, No.

06-CV-3828 (JFB) (WDW), 2009 WL 804722, at *13 n.6 (E.D.N.Y. Mar. 26, 2009)

("[D]efendant has offered a legitimate, non-discriminatory reason for its action—namely, that

plaintiff was continuously absent from work from June 8, 2005 to October 17, 2005, without

approved leave or the submission of appropriate medical documentation."); *Constance v. Pepsi*

*Bottling Co. of NY*, No. 03-CV-5009 (CBA) (MDG), 2007 WL 2460688, at *24 (E.D.N.Y. Aug.

24, 2007) ("Many courts have found job abandonment and excessive absenteeism to be

legitimate business reasons for termination.") (collecting cases); *Jackson v. Nor Loch Manor*

*Healthcare Facility*, 297 F. Supp. 2d 633, 636 (W.D.N.Y. 2004), *aff'd*, 134 F. App'x 477 (2d

Cir. 2005) ("Certainly, an employer is entitled to discharge an employee who fails to follow

company rules and fails to appear for work without notification, even if the absences are

attributable to a medical problem.").

### c. No Pretext for Discrimination

To meet her burden at the third step of the *McDonnell Douglas* framework, plaintiff must

"identify evidence that would allow a reasonable fact finder to conclude that Defendants'

explanation is pretext and discrimination more likely than not motivated Defendants." *Fenner v.*

*News Corp.*, No. 09-CV-9832 (LGS), 2013 WL 6244156, at *22 (S.D.N.Y. Dec. 2, 2013). Here,

plaintiff argues that defendants' "false . . . and mistaken basis for terminating a supervising nurse

while on leave recovering from a work related injury, is the clearest example of pretext one

could find." Pl. Opp. ¶ 71. According to plaintiff, defendants' proffered explanation for her

termination was "fabricated" to conceal that she was terminated "for reasons involving [her] age

[or] national origin." *Id.*

Plaintiff has not offered evidence to support this theory. To begin, plaintiff has not

directed the Court to evidence that defendants' stated reason for her termination was false.

Plaintiff alleges that she faxed medical documentation to defendants monthly to update them on her condition. Pl. Opp. ¶ 40. Even if plaintiff did so and she was thereby in compliance with defendants' leave policies, the indefinite nature of plaintiff's absence may have still formed a legitimate basis for her termination. *See, e.g., Daley v. Cablevision Sys. Corp.*, No. 12-CV-6316 (NSR), 2016 WL 880203, at *6 (S.D.N.Y. Mar. 7, 2016), *aff'd*, 675 F. App'x 97 (2d Cir. 2017) (employer not required "'to hold an injured employee's position open indefinitely while the employee attempts to recover'") (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000)).

More important, even if the Court assumes that defendants' stated reasons for terminating plaintiff were false, plaintiff has cited no evidence that Ballard (or anyone else involved in the decision to terminate her) were motivated by discriminatory animus. *See Shepherd v. BCBG Max Azria Grp., Inc.*, No. 11-CV-7634 (RJS) (AJP), 2012 WL 4832883, at *20 (S.D.N.Y. Oct. 11, 2012), *adopted by*, 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012) ("Even assuming *arguendo* that [plaintiff] has presented sufficient evidence to show that [defendant's] proffered non-discriminatory justification is false, that does not suffice to satisfy the third prong of the *McDonnell Douglas* test, which [also] requires a showing . . . that the real reason is discrimination") (citing cases). Absent such evidence, there is no triable issue of fact. *See Escribano v. Greater Hartford Acad. of Arts*, 449 F. App'x 39, 41 (2d Cir. 2011) (to show pretext, plaintiff must offer "'not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason' for the challenged actions") (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)). For

these reasons, the Court concludes that defendants are entitled to summary judgment with respect to plaintiff's state and federal discrimination claims.

### 3. City Claims

Courts must analyze CHRL claims "separately and independently from any federal and state law claims, construing [CHRL] provisions broadly in favor of discrimination plaintiffs." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75 (2d Cir. 2015) (internal alternations and quotation marks omitted). Although courts evaluate CHRL claims using the *McDonnell Douglas* framework set forth above, a plaintiff asserting a CHRL claim must only show that "her employer treated her less well, at least in part for a discriminatory reason." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013); *see also McCalla v. City of New York*, No. 15-CV-8002 (LAK) (AJP), 2017 WL 3601182, at *44 (S.D.N.Y. Aug. 14, 2017). Thus, under the CHRL, the adverse employment action need not be "material[]." *See, e.g.*, *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812 (CM) (JCF), 2015 WL 1499618, at *39 (S.D.N.Y. Mar. 27, 2015), *aff'd*, 2017 WL 2889483 (2d Cir. July 7, 2017) ("[C]ase law . . . removed the materiality requirement from the NYCHRL's adverse action prong"). Also, though the "employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, . . . it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played no role in its actions." *Mihalik*, 715 F.3d at 110 n.8 (internal alternations, emphasis, and quotation marks omitted).

Although plaintiff argues that she was treated less well than Hollingsworth, Constantine, and Harris during her employment with SNCC, evidence supporting this contention is lacking. *See supra* at 16–17. Plaintiff testified that Wilson had said that she was "the older and . . . more experience[d]" one when assigning her tasks, Pl. Opp. ¶ 75, but plaintiff has failed to cite

23

evidence that her workload differed from that of similarly situated younger coworkers such as Hollingsworth. *See supra* at 4 n.4, 16–17. Plaintiff asserts that Constantine was permitted to take leave without completing FMLA paperwork and that Harris failed to complete reports but was never written up. *Id.* at 16–17. These contentions, however, lack evidentiary support. Thus, there is not a triable dispute of fact as to whether plaintiff was treated less well than her coworkers. *See, e.g., Fenner*, 2013 WL 6244156, at *14 (dismissing CHRL claim of race discrimination on summary judgment where plaintiffs argued that "they were treated worse than their white colleagues in a multitude of ways—lower pay, inferior assignments, dismissive supervisors, less access to resources—but they have not supported their allegations with evidence").

No evidence suggests that discrimination played any role in plaintiff's termination. *See supra* at 14–17. Indeed, Ballard attests that she was unaware of plaintiff's protected characteristics at the time of her decision to terminate plaintiff, and plaintiff has offered no evidence to the contrary. *Id.* at 14. Notwithstanding any discriminatory comments made by other SNCC employees, plaintiff has not cited evidence that anyone who made such remarks was involved in her termination. *Id.* at 14–15. Consequently, no triable issue of fact exists as to whether discrimination played a role in this action. *See Joseph v. Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 321 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x 29 (2d Cir. 2015) (dismissing CHRL claim where "[o]ther than Plaintiff's allegations that a co-worker—who Plaintiff has not shown had any involvement with Plaintiff's termination, or any influence over the decision makers—made racially insensitive comments to him, there is no evidence whatsoever that the individuals who decided to terminate Plaintiff harbored any discriminatory animus"). For these reasons, summary judgment is granted with respect to plaintiff's CHRL discrimination claims.

## C.    Retaliation Claims

### 1.    *McDonnell Douglas* Burden-Shifting Framework

Plaintiff claims that she was retaliated against for filing an EEOC charge of discrimination in violation of § 1981, the SHRL, and CHRL. Compl. ¶ 83; Pl. Opp. ¶¶ 94–98. Such claims are subject to the three-step *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *McCalla*, 2017 WL 3601182, at *27. At the first step, the plaintiff must make out a *prima facie* case of retaliation by demonstrating that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the plaintiff suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action. *See, e.g. Pena-Barrero v. City of New York*, No. 14-CV-9550 (VEC), 2017 WL 1194477, at *17 (S.D.N.Y. Mar. 30, 2017) (citing *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)). To satisfy the third prong under the CHRL, the plaintiff need not prove that the adverse employment action was material—only that "something happened that would be reasonably likely to deter a person from engaging in protected activity." *Salahuddin v. New York City Dep't of Educ.*, No. 15-CV-6712 (LTS) (DCF), 2017 WL 3724287, at *3 (S.D.N.Y. Aug. 28, 2017) (internal quotation marks omitted).

If plaintiff makes out a *prima facie* case, the employer must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Forest v. New York State Office of Mental Health*, 672 F. App'x 42, 43 (2d Cir. 2016). If the employer does so, the burden shifts to the plaintiff to demonstrate that the proffered reason was pretextual and that discrimination was a but-for cause of the adverse employment action. *See, e.g.*, *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 7 (2d Cir. 2017); *South v. Cont'l Cas. Co.*, No. 15-CV-1627 (WHP), 2017 WL 782909, at *4 (S.D.N.Y. Feb. 28, 2017). Under the CHRL, however, "'summary judgment is appropriate

only if the plaintiff cannot show that retaliation played any part in the employer's decision.'"

*Marshall v. Kingsborough Cmty. Coll. of Cuny*, No. 11-CV-2686 (PKC) (RML), 2015 WL

5773748, at *9 (E.D.N.Y. July 27, 2015), *adopted by*, 2015 WL 5774269 (E.D.N.Y. Sept. 30,

2015) (quoting *Mihalik*, 715 F.3d at 116).

### 2.    Application to Federal, State, and City Claims

Defendants concede that all elements of the *prima facie* case are met except the fourth

one, which requires plaintiff to demonstrate a causal link between the protected activity and

adverse employment action. Def. Mem. at 22–25. Defendants admit that plaintiff engaged in a

protected activity when she filed an EEOC charge on February 24, 2011, and that defendants

became aware of the charge by notice dated March 4. *Id.* at 22–23; *see supra* at 5.[12]   More than

six months later, on September 20, plaintiff was terminated. *See supra* at 8.   District courts in

the Second Circuit "have consistently held that the passage of two to three months between the

protected activity and the adverse employment action does not allow for an inference of

causation to make a *prima facie* case." *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp.

3d 141, 195 (E.D.N.Y. 2015) (internal quotation marks omitted); *see also Baldwin v. Cablevision

Sys. Corp.*, 888 N.Y.S.2d 1, 6 (1st Dep't 2009) (four months between protected act and alleged

retaliatory action was "not temporally proximate enough to satisfy the causality element of

plaintiff's [CHRL] retaliation claim").

Here, the gap of more than six months is too large for plaintiff to establish a causal link

though temporal proximity alone.   In opposition, plaintiff points to no other evidence of

causation.   Pl. Opp. ¶¶ 94–98.   Plaintiff notes that she stopped working a few weeks after filing

---

[12] Defendants represent that plaintiff's EEOC filing was her only protected activity. Def. Mem.
at 22–24.   Plaintiff has not asserted any claims of retaliation based on any other protected
activity in her complaint or opposition papers.

the EEOC charge, which, according to plaintiff, "basically eliminated the need to terminate the Plaintiff immediately . . . because . . . she was no longer at the job physically." *Id.* ¶ 96. On the present record, the relevance of plaintiff's absence is unclear. There is, for example, no evidence that plaintiff's absence would have made it more difficult to terminate her earlier than September. *Cf. Espinal v. Goord*, 558 F.3d 119, 129–30 (2d Cir. 2009) (retaliation may not have been feasible until six months passed); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (opportunity to retaliate only arose after eight months). Nor is there evidence that plaintiff was on the verge of returning when she was terminated so as to make the timing of her termination suspicious. With respect to her termination, plaintiff has failed to establish the fourth element of her *prima facie* case.

For purposes of her CHRL claim, plaintiff has not argued that other adverse employment actions, aside from her termination, were retaliatory. Pl. Opp. ¶¶ 94–98; *see also* Compl. ¶ 83. Nonetheless, the Court notes that, by the time that she filed her EEOC charge, plaintiff had already returned to working evening shifts, and she had already received the written warning for failing to complete survey-related audit summaries. Consequently, these actions cannot form the basis of a retaliation claim. *See Adams v. City of New York*, 837 F. Supp. 2d 108, 123 (E.D.N.Y.2011) (actions preceding protected activity "cannot be retaliatory as a matter of law and logic"). To the extent that plaintiff believes that approval of her leave request was delayed because of her EEOC charge, plaintiff has cited no evidence that defendants' human-resources representatives, or the outside company that handled her FMLA request, knew about her charge, or that they were influenced by someone with this knowledge. *See Seivright v. Montefiore Med. Ctr.*, No. 11-CV-8934 (AJN), 2014 WL 896744, at *12 (S.D.N.Y. Mar. 3, 2014) ("Second Circuit precedent suggests that where the individual decision-maker lacked knowledge of the

protected activity, there must be evidence that the decision-maker was at least influenced or encouraged to take the adverse action by a superior with knowledge of the protected activity."). For these reasons, plaintiff has failed to satisfy the fourth element of her *prima facie* case.

Even if plaintiff had established a *prima facie* case, defendants have articulated legitimate, non-retaliatory reasons for their actions. As noted above, plaintiff's six-month absence formed a legitimate basis for her termination. *See supra* at 20–21. To the extent that plaintiff believes that defendants' actions with respect to her FMLA leave request were retaliatory, defendants had a legitimate interest in securing documentation certifying the reasons for her leave. *See Klausner v. Indus. Risk Insurers, Inc.*, No. 98-CV-1267 (RPP), 1999 WL 476285, at *5 (S.D.N.Y. July 8, 1999) ("[I]t is legitimate and nondiscriminatory for an employer to want to know that an employee is absent because of an unavoidable medical problem as opposed to her desire simply not to come to work.").

At the third step, plaintiff argues that defendants' stated reason for her termination was "fabricated" and that their "motivation to terminate Plaintiff was related her protected activity." Pl. Opp. ¶¶ 95, 98. Yet plaintiff cites no evidence to support this theory and, as a result, does not carry her burden at this step of the *McDonnell Douglas* framework. *See supra* at 21–23; *e.g.*, *McWhite v. New York City Hous. Auth.*, No. 05-CV-991 (NG) (LB), 2008 WL 1699446, at *12 (E.D.N.Y. Apr. 10, 2008) (granting summary judgment where "plaintiff offers no evidence to prove that [defendant's proffered] reason is false"). Even assuming that defendants' stated reasons for plaintiff's termination are false, plaintiff must offer evidence that retaliation was a real reason for her termination, which plaintiff fails to do. *See Marshall v. NYC Bd. of Elections*, 322 F. App'x 17, 19 (2d Cir. 2009) (even if defendants' stated reasons for the adverse action

were pretextual, plaintiff must still offer evidence that the reasons were a pretext for retaliation) (citing *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001)).[13]

## III.   Conclusion

For these reasons, defendants' motion for summary judgment (Dkt. No. 65) is granted. Defendants' motion to strike (Dkt. No. 70) is denied as moot.  The Clerk of Court is directed to enter judgment and close the case.

**SO ORDERED.**

s/SLT

_____

SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
*September 28*, 2017

---

[13] Defendants argue that plaintiff is precluded from seeking damages given that she has not searched for employment or applied for any positions since she stopped working for SNCC in March 2011.  Def. Mem. at 25.  Given that plaintiff's underlying claims are dismissed, the Court need not address issues involving damages.